**UNITED STATES DISTRICT COURT**
**EASTERN DISTRICT OF MICHIGAN**
**SOUTHERN DIVISION**

SHANNON HELSEL,

                           CASE NO. 15-13599

          *Plaintiff*,          DISTRICT JUDGE AVERN COHN

*v.*                           MAGISTRATE JUDGE PATRICIA T. MORRIS

COMMISSIONER OF SOCIAL SECURITY,

          *Defendant.*

_____/

**MAGISTRATE JUDGE'S REPORT AND RECOMMENDATION ON CROSS**
**MOTIONS FOR SUMMARY JUDGMENT (Docs. 14, 16)**

## I.     RECOMMENDATION

      In light of the entire record in this case, I suggest that substantial evidence supports the Commissioner's determination that Helsel is not disabled. Accordingly, **IT IS RECOMMENDED** that Helsel's Motion for Summary Judgment (Doc. 14) be **DENIED**, the Commissioner's Motion (Doc. 16) be **GRANTED**, and that this case be **AFFIRMED**.

## II.    REPORT

### A. Introduction and Procedural History

      Pursuant to 28 U.S.C. § 636(b)(1)(B), E.D. Mich. LR 72.1(b)(3), and by Notice of Reference, this case was referred to the undersigned magistrate judge for the purpose of reviewing a final decision by the Commissioner of Social Security ("Commissioner") denying Plaintiff's claim for a period of disability and Disability Insurance Benefits

1

("DIB") under Title II of the Social Security Act 42 U.S.C. § 401 *et seq.* (Doc. 3). The matter is currently before the Court on cross-motions for summary judgment. (Docs. 14, 16).

Plaintiff Shannon Helsel filed an application for Supplemental Security Income (SSI) on September 14, 2012, (Tr. 176), and the Commissioner denied her claim. (Tr. 97-104). Helsel then requested a hearing before an Administrative Law Judge ("ALJ"), which occurred on February 26, 2014, before ALJ Kevin Detherage (Tr. 27-72). At the hearing, Helsel—represented by her attorney, Edward Gallagher II—testified, alongside Vocational Expert ("VE") Jessica Christensen. (*Id.*). The ALJ's written decision, issued May 9, 2014, found Helsel not disabled. (Tr. 8-22). On August 25, 2015, the Appeals Council denied review, (Tr. 1-4), and Helsel filed for judicial review of that final decision on October 14, 2015. (Doc. 1).

### B.  Standard of Review

The district court has jurisdiction to review the Commissioner's final administrative decision pursuant to 42 U.S.C. § 405(g). The district court's review is restricted solely to determining whether the "Commissioner has failed to apply the correct legal standard or has made findings of fact unsupported by substantial evidence in the record." *Sullivan v. Comm'r of Soc. Sec.*, 595 F App'x. 502, 506 (6th Cir. 2014) (internal quotation marks omitted). Substantial evidence is "more than a scintilla of evidence but less than a preponderance; it is such relevant evidence as a reasonable mind

might accept as adequate to support a conclusion." *Rogers v. Comm'r of Soc. Sec.*, 486 F.3d 234, 241 (6th Cir. 2007) (internal quotation marks omitted).

The Court must examine the administrative record as a whole, and may consider any evidence in the record, regardless of whether it has been cited by the ALJ. *See Walker v. Sec'y of Health & Human Servs.*, 884 F.2d 241, 245 (6th Cir. 1989). The Court will not "try the case de novo, nor resolve conflicts in the evidence, nor decide questions of credibility." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 286 (6th Cir. 1994). If the Commissioner's decision is supported by substantial evidence, "it must be affirmed even if the reviewing court would decide the matter differently and even if substantial evidence also supports the opposite conclusion." *Id.* at 286 (internal citations omitted).

### C. Framework for Disability Determinations

Under the Act, "DIB and SSI are available only for those who have a 'disability.'" *Colvin v. Barnhart*, 475 F.3d 727, 730 (6th Cir. 2007). "Disability" means the inability

> to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than [twelve] months.

42 U.S.C. §§ 423(d)(1)(A), 1382c(a)(3)(A) (DIB); 20 C.F.R. § 416.905(a) (SSI). The Commissioner's regulations provide that disability is to be determined through the application of a five-step sequential analysis:

> Step One:  If the claimant is currently engaged in substantial gainful activity, benefits are denied without further analysis.

3

> Step Two:  If the claimant does not have a severe impairment or combination of impairments that "significantly limits . . . physical or mental ability to do basic work activities," benefits are denied without further analysis.
>
> Step Three:  If the claimant is not performing substantial gainful activity, has a severe impairment that is expected to last for at least twelve months, and the severe impairment meets or equals one of the impairments listed in the regulations, the claimant is conclusively presumed to be disabled regardless of age, education or work experience.
>
> Step Four:  If the claimant is able to perform his or her past relevant work, benefits are denied without further analysis.
>
> Step Five:  Even if the claimant is unable to perform his or her past relevant work, if other work exists in the national economy that plaintiff can perform, in view of his or her age, education, and work experience, benefits are denied.

20 C.F.R. §§ 404.1520, 416.920. *See also Heston v. Comm'r of Soc. Sec.*, 245 F.3d 528, 534 (6th Cir. 2001). "Through step four, the claimant bears the burden of proving the existence and severity of limitations caused by [his or] her impairments and the fact that she is precluded from performing [his or] her past relevant work." *Jones v. Comm'r of Soc. Sec.*, 336 F.3d 469, 474 (6th Cir. 2003). The burden transfers to the Commissioner if the analysis reaches the fifth step without a finding that the claimant is not disabled. *Combs v. Comm'r of Soc. Sec.*, 459 F.3d 640, 643 (6th Cir. 2006). At the fifth step, the Commissioner is required to show that "other jobs in significant numbers exist in the national economy that [the claimant] could perform given [his or] her RFC [residual functional capacity] and considering relevant vocational factors." *Rogers*, 486 F.3d at 241 (citing 20 C.F.R. §§ 416.920(a)(4)(v), (g)).

4

Under the authority of the Social Security Act, the SSA has promulgated regulations that provide for the payment of disabled child's insurance benefits if the claimant is at least eighteen years old and has a disability that began before age twenty-two (20 C.F.R. 404.350(a) (5) (2013). A claimant must establish a medically determinable physical or mental impairment (expected to last at least twelve months or result in death) that rendered her unable to engage in substantial gainful activity. 42 U.S.C. § 423(d)(1)(A). The regulations provide a five-step sequential evaluation for evaluating disability claims. 20 C.F.R. § 404.1520.

### D. ALJ Findings

Following the five-step sequential analysis, the ALJ found Helsel not disabled under the Act. (Tr. 8-22). At Step One, the ALJ found that Helsel had not engaged in substantial gainful activity following the date of the application, i.e., September 14, 2012. (Tr. 13). At Step Two, the ALJ concluded that the following impairments qualified as severe: "depression, an affective disorder, a learning disability, post-traumatic stress disorder (PTSD), and status-post a left foot bunionectomy." (Tr. 13-16). The ALJ also decided, however, that none of these met or medically equaled a listed impairment at Step Three. (Tr. 16-17). Following this, the ALJ found that Helsel had the residual functional capacity ("RFC") to perform light work with the following additional limitations:

> Limited to simple, routine, and repetitive tasks in a work environment free of fast paced production requirements involving only simple work related decisions and routine work place changes. Can never climb ladders, ropes, or scaffolds. Can never operate foot controls with the lower extremities. The claimant is likely to be off task 8% of the work period. The claimant

can have occasional contact with co-workers, supervisors, and the general public.

(Tr. 17). The ALJ found Plaintiff did not have past relevant work so he proceeded directly to Step Five. (Tr. 20). At Step Five, the ALJ determined that there are jobs that exist in significant numbers in the national economy that the claimant can perform, and thus found Helsel not disabled. (Tr. 21-22).

### E.  Administrative Record

#### 1.  Medical Evidence

When Helsel began experiencing "behavioral difficulties" in school in 2007, her parents referred her to counseling. (Tr. 303). She then met with Dr. Kerri Schroder, her school's psychologist upon the recommendation of the Department of Human Services. (Tr. 305). Helsel traced her difficulty concentrating, sitting still, and getting "good grades" to a variety of factors, notably her childhood rape at the hands of her uncle. *Id.* Between the ages of thirteen and sixteen, she smoked crack and used intravenous morphine. (Tr. 471). The administration of various tests revealed a verbal IQ score of 73, susceptibility "to episodes of affective disturbance…likely to involve features of depression," and "difficulty in thinking logically and coherently," among other issues. (Tr. 307-08). She was in special education for math. (Tr. 43, 472).  Dr. Schroder diagnosed her with "Bipolar Disorder, likely rapid cycling" and noted that "Fetal Alcohol Effects appears to play a significant factor in her difficulty with comprehension, impulsivity and inability to self soothe." (Tr. 309).

In May of 2011, Helsel sought treatment for chest and left arm pain at Mercy Hospital Grayling. Records from that visit show a normal baseline heart rhythm, and a lack of tachycardia and electrocardiographic abnormalities. (Tr. 339). A later record from the same hospital in November similarly notes "[n]o sustained atrial or ventricular arrhythmias." (Tr. 407). Documentation from Helsel's screening at Northern Lakes Community Mental Health ("NLCMH") the following year interprets her heart concerns as a manifestation of "really bad anxiety." (Tr. 366). Her initial clinical assessment at NLCMH found that she "meets diagnostic criteria for psychotic disorder, PTSD, social phobia and Depressive disorder [not otherwise specified]." (Tr. 427).

Some of Helsel's physical symptoms also surfaced around this time, including her alleged back pain. On March 23, 2011, Helsel experienced an "acute onset of left-sided flank pain" which doctors at Mercy Hospital in Grayling, Michigan, traced to a left renal stone. (Tr. 348-49). For this, she was discharged the following day. *Id.*

In December of 2012, Dr. Theodore Brooks performed a physical examination. He found that Helsel presented "extremely poor hand grip strength," "expressed sharp pain in the left foot radiating toward the knee upon movement as well as . . . sharp pain on palpation of the plantar or dorsal service of the foot," "pain in her left foot upon the straight leg raising test and upon walking on the heels and toes and in tandem with a gait favoring the left foot, and pain upon dorsal flexion and plantar flexion of the left ankle." (Tr. 442). He also recorded an "abnormal . . . slow shuffling gait." (Tr. 440-41). Mr. Brooks found a normal range of motion in the cervical and lumbar spine. (Tr. 445). In a

later examination made in January of 2013, Dr. Brooks observed that her "gait was steady with no observed anomalies." (Tr. 450).

In March of 2013, Dr. Neal Fellows authored a psychological evaluation and assessment. He described her "fairly classic symptoms of posttraumatic stress disorder" and "symptoms that are suggestive of borderline personality disorder also probably related to her trauma." (Tr. 472). In an aside, Dr. Fellows suggested that her "auditory hallucinations are more in response to trauma and not suggestive of schizophrenia." *Id.* He proceeded to diagnose Helsel with PTSD, ruled out psychosis, and marked "[p]sychosocial stressors" as "moderate." *Id.* Two months later, Dr. Fellows prescribed Benadryl to assist Helsel with her sleeping problems. (Tr. 474). In February of 2014, Dr. Fellows counter-signed an assessment issued by Nanci Karczewski, Helsel's therapist at NLCMH, which diagnosed PTSD, Social Phobia, Psychotic Disorder not otherwise specified, Depressive Disorder, and Personality Disorder not otherwise specified. (Tr. 486). The assessment listed Helsel as markedly limited in: six of eight factors related to "Sustained Concentration and Persistence"; one of three factors related to "Understanding and Memory"; three of five factors related to "Social Interaction"; and two of four factors related to "Adaptation." (Tr. 484-86).

In March of 2013, Dr. Paul Winkler performed a formal mental status evaluation to assist in determining disability status. Among other things, he described "good eye contact" and "pleasant" demeanor, "logical" thought processes, active visual and auditory hallucinations, and a "depressed [mood] with anxiety behind it." (Tr. 450). Though he acknowledged these hallucinations as "distasteful," Dr. Winkler equivocated, noting also

that they appear "external to her" and "thus ego dystonic… [sic] a potential positive relative to treatment considerations."  He diagnosed her with "Major Depression, recurrent, severe," "Psychosis [not otherwise specified]," and "Learning Disability [not otherwise specified]," describing her "Task Capabilities" as "[v]ery limited to none at present." (Tr. 452).

### 2.  Application Reports and Administrative Hearing

### a.  Function Report

Helsel completed two function reports, one on March 8, 2012, and the other on October 23, 2012. In the first, she listed an inability to focus, constant anger, paranoia, and depression as conditions limiting her ability to work. (Tr. 219). She lives alone with her eight-month old son, and describes a typical day as trying to get him through the day. (Tr. 220). She changes his diapers, cleans him, feeds him, and "make[s] him laugh." *Id.* In addition to her problems with focus, she alleges fear she will "die in my sleep" and has trouble resting. *Id.* She alleges an ability to clean and do laundry so long as someone helps or reminders her, because she "get[s] sidetract [sic]" and forgets. (Tr. 221). She does not prepare her own meals because "I dont [sic] like to stand very long[,] [i]t hurts my foot," but prepares ramen noodles weekly, which takes ten minutes. *Id.* She can ride in a car and take public transportation, but does not have a license to drive. (Tr. 222). She shops about once a month for "food, baby stuff, clothes for baby," pays bills, counts change, handles a savings account, and uses a checkbook. *Id.* She alleges not spending time with others, but goes to church on a "regular basis," though she needs someone to

accompany her. (Tr. 223). She spends little time with family, friends, and neighbors because "I dont [sic] like to [sic] many people, and I get mad easily." (Tr. 224). She alleges difficulty "standing, walking, [and] climbing" because of her left foot. (Tr. 224). She can walk a block-and-a-half before resting for five minutes. (Tr. 225). In her remarks, she notes "heart problems" as well. (Tr. 226).

Her second function report contains more details about her alleged disabilities. In it, she says "I hear voices" and "I've tried to work and I lash out, [and] get fired. I just cant [sic] stay focused." (Tr. 248). Now, however, she prepares her own meals daily, though she "cant [sic] stand on my left foot cuz [sic] it hurts." (Tr. 250). She indicates that her husband must give her reminders to do certain things, even though they are separated. (Tr. 31, 248-50). On this form, she gets around by walking and public transportation, though not alone "because I don't like being alone at all." (Tr. 251). Her hobbies are "playing inside with my son, and reading his books with him," which is consistent with her first function report. (Tr. 252). Under social activities, she lists seeing her therapist at the mental health building once a week, though "sometimes I forget." *Id.* She indicates that her illnesses have made her "more depressed, more angry, and always here [sic] voices." She can walk "half a block" before resting for several minutes. (Tr. 253). Her foot hurts because she has "screws in [it]." *Id.* She takes Benedryl for sleep and took Zoloft until it caused "suicide [sic] thoughts." (Tr. 255).

Helsel's friend, Kerri Heinz, also submitted two function reports, one on March 8, 2012, the other on October 26, 2012. In both, she alleges spending time with Helsel every day at her apartment. (Tr. 208, 260). There's a small contrast between Ms. Heinz's first

10

and second reports, in that the first (unlike the second) says Helsel does not pay bills or use a checkbook because she "has a hard time with holding on to money and has a hard time with spelling." (Tr. 211). In all other respects, however, Ms. Heinz's reports are substantially consistent with each other and with Helsel's.

### b.  Helsel's Testimony at the Administrative Hearing

At her hearing, Helsel testified that she is married but separated, and lives alone with her two children. (Tr. 31-32). She attended seven different schools by the time she was in the ninth grade because "I'd get in trouble for fighting." (Tr. 60). She dropped out of school in the tenth grade, (Tr. 31), and has lived on her own since the age of nineteen. (Tr. 49). At the hearing she was pregnant with a third child. (Tr. 32). She had no present source of income, and she testified that her last job working at Subway ended six months ago. (Tr. 33). Before that she worked as a cashier for a gas station. (Tr. 34). She testified that she was terminated from both jobs because she "couldn't concentrate." (Tr. 35). When asked what ailments prevent her from working, she testified that "I don't like people" and "I get really scared. And I can't concentrate, and I always forget stuff. Like simple things." (Tr. 35-36). Although she applied for a janitorial position with a nursing home "almost a year ago," she thinks she would turn it down if they called and offered her work because "I can't be around people." (Tr. 52). She does not want a baby sitter or nanny position because "I don't like kids but my own." (Tr. 53).

She started having troubles with depression when she was molested by her uncle, and "ever since then . . . I went to counseling." (Tr. 40). She sees Nancy Durkeski, her

11

therapist once every week or two weeks. *Id.* For her mood, she takes Effexor and Latuda, and she soothes her "sleep and anxiety" with Benadryl. (Tr. 41). She has "been in the hospital quite a few times with anxiety," and the last time was "[a] year ago." (Tr. 50). She hears voices and "[s]ome of them tell me to hurt myself," though she acted upon these directions. (Tr. 51). She has a history of hitting and cutting herself, though she testified that now, "I don't necessarily cut myself. I just – I get really just really depressed." (Tr. 61). She feels people are watching her "[w]herever I'm at." (Tr. 65).

She also testified as to "problems standing on my legs for more than a long period of time." (Tr. 36). She attributes the pain in her left foot to a bunion surgery "[s]ix, seven years ago. If I stand on it for more than like 15 minutes, it'll get all big." (Tr. 36). She can lift approximately twenty-five pounds, and she can walk comfortably "probably from here to like the door out there." (Tr. 39). She can stand for ten to fifteen minutes, and experiences difficulty sitting straight. *Id.* After standing, her foot "turns black and blue like where my toes are for my incision . . . . [I]f you put your fingers on the top of my foot, you can feel it grind." (Tr. 62-63). Though she can climb her stairs, "it's hard. I have to hold the railing." (Tr. 63). For back pain, she takes Norco. (Tr. 37). She testified that such pain might derive from gallstones, but her doctors are not sure because "they haven't did [sic] an x-ray because I'm pregnant." (Tr. 38-39).

She testified to troubles doing household chores and preparing meals, though she likes "easy meals" that "you can pop in the microwave." (Tr. 41). Her friend, Ms. Heinz comes over to help because "I can't stand on my feet for very long," as does her mom, who helps do dishes and laundry. *Id.* Helsel testified that she could do laundry "if I sit

down . . . I have to sit when I do most things because it hurts." (Tr. 42). When she cooks, she "forget[s] stuff on the stove," which is why she asks her father to buy "Ramen noodle cups or macaroni and cheese cups and the hot dogs and stuff like that . . . because it's so simple." (Tr. 64).

Helsel does not drive because she failed the road test, even though she passed the written test. (Tr. 42). She was in special education for math, and she testified to difficulty reading because "I read backwards." (Tr. 43-44). She is the primary caregiver for her two children, testifying that "it has like its downs and it's hard," but she ultimately believes she's doing a good job. (Tr. 45). She changes her youngest child's diaper, but her eldest "[c]hanges himself" by "tak[ing] the pull up down and wip[ing] himself and put[ing] a pull up back on." *Id.* She keeps a gate to confine the children to the front room because "I can't chase them." (Tr. 46). When asked if anyone helps with the children, Helsel testifies: "My husband's not in the picture. My friend helps me, . . . and my mom." (Tr. 46-47). She takes the bus to get to her doctors' appointments, but otherwise she testified "I just sit in the house. . . . I watch TV with the kids or I draw." (Tr. 48).

### c.  The VE's Testimony at the Administrative Hearing

The ALJ then called upon the services of a VE to determine Helsel's ability to perform work. (Tr. 67). The ALJ concluded that there was no past relevant work and proceeded to ask the VE to assume a hypothetical individual able to "perform light work" limited to "simple, routine, and repetitive tasks in a work environment free of fast paced production requirements, involving only simple work-related decisions and routine

workplace changes"; this individual would be off-task "eight percent of the work period," could "never climb ladders, ropes or scaffolds," and could "never operate foot controls with the lower extremities," though she could "have occasional contact with coworkers, supervisors and the general public." *Id.* The VE found several examples of suitable employment: "[S]orter of agricultural produce," with an SVP level of two, involves "light work." (Tr. 68). The "lower peninsula of Michigan" has 1,100 such jobs available, while 49,000 exist in the national economy. *Id.* Another is "garment sorter," with an SVP level of two, and involves light work. *Id.* There exist 1,200 such jobs in the region and 51,000 in the national economy. The final job discussed was "folder" with an SVP level of two, involving "light work." There exist 1,150 such jobs in the region, and 51,000 in the national economy. Each job discussed could be performed "with a sit/stand option." (Tr. 69).

The second hypothetical mirrored the first except that this individual "is going to be off task 20 percent of the workday." (Tr. 68). The VE found that this percentage of off-task time "would preclude all work." (Tr. 69). He then indicated that "if an individual is off task ten percent of a work shift or more, that would preclude all work." (Tr. 70).

### F.  Governing Law

The ALJ must "consider all evidence" in the record when making a disability decision. 42 U.S.C. § 423(d)(5)(B).       The regulations carve the evidence into various categories, "acceptable medical sources" and "other sources." 20 C.F.R. § 404.1513. "Acceptable medical sources" include, among others, licensed physicians and licensed or

14

certified psychologists. *Id.* § 404.1513(a). "Other sources" include medical sources who are not "acceptable" and almost any other individual able to provide relevant evidence. *Id.* § 404.1513(d). Only "acceptable medical sources" can establish the existence of an impairment. SSR 06-03p, 2006 WL 2329939, at *2. Both "acceptable" and non-acceptable sources provide evidence to the Commissioner, often in the form of opinions "about the nature and severity of an individual's impairment(s), including symptoms, diagnosis and prognosis, what the individual can still do despite the impairment(s), and physical and mental restrictions." *Id.* at *2. When "acceptable medical sources" issue such opinions, the regulations deem the statements to be "medical opinions" subject to a multi-factor test that weighs their value. 20 C.F.R. § 404.1527. Excluded from the definition of "medical opinions" are various decisions reserved to the Commissioner, such as whether the claimant meets the statutory definition of disability and how to measure his or her RFC. *Id.* at 404.1527(d).

The ALJ must use a six-factor balancing test to determine the probative value of medical opinions from acceptable sources. 20 C.F.R. § 404.1527(c). The test looks at whether the source examined the claimant, "the length of the treatment relationship and the frequency of examination, the nature and extent of the treatment relationship, supportability of the opinion, consistency of the opinion with the record as a whole, and specialization of the treating source." *Wilson v. Comm'r of Soc. Sec.*, 378 F.3d 541, 544 (6th Cir. 2004); *see also* 20 C.F.R. § 404.1527(c). ALJs must also apply those factors to "other source" opinions. *See Cruse v. Comm'r of Soc. Sec.*, 502 F.3d 532, 540-42 (6th Cir. 2007); SSR 06-03p, 2006 WL 2329939, at *2 (Aug. 9 2006).

15

Certain opinions of a treating physician, in contrast, receive controlling weight if they are "well-supported by medically acceptable clinical and laboratory diagnostic techniques" and are "not inconsistent with the other substantial evidence in [the] case record." 20 C.F.R. § 404.1527(d)(2). *See also Wilson*, 378 F.3d at 544. The only opinions entitled to dispositive effect deal with the nature and severity of the claimant's impairments. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). Therefore, the ALJ does not owe a treating opinion deference on matters reserved to the Commissioner. 20 C.F.R. § 404.1527(d); SSR 96-2p, 1996 WL 374188, at *1-2 (July 2, 1996). The ALJ "will not give any special significance to the source of an opinion" regarding whether a person is disabled or unable to work, whether an impairment meets or equals a Listing, the individual's RFC, and the application of vocational factors. 20 C.F.R. § 404.1527(d)(3).

The regulations mandate that the ALJ provide "good reasons" for the weight assigned to the treating source's opinion in the written determination. 20 C.F.R. § 404.1527(c)(2); *see also Dakroub v. Comm'r of Soc. Sec.*, 482 F.3d 873, 875 (6th Cir. 2007). Therefore, a decision denying benefits

> must contain specific reasons for the weight given to the treating source's medical opinion, supported by the evidence in the case record, and must be sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's opinion and the reasons for that weight.

SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996). *See also Rogers*, 486 F.3d at 242. For example, an ALJ may properly reject a treating source opinion if it lacks supporting objective evidence. *Revels v. Sec'y of Health & Human Servs.*, 882 F. Supp. 637, 640-41

16

(E.D. Mich. 1994), *aff'd*, 51 F.3d 273, 1995 WL 138930, at *1 (6th Cir. 1995) (unpublished table decision).

### G. Analysis

Though Plaintiff's brief fails to clearly frame its legal arguments, this Court will, to the best of its ability, attempt to divine from her language those which appear most evident. Helsel argues that the ALJ acted contrary to case law, Social Security Rulings 96-2p, 1996 WL 374188 (July 2, 1996) and 96-8p, 1996 WL 374184 (July 2, 1996), as well as 20 C.F.R. § 404.1527, in rendering his decision. Specifically, she posits: (1) that the ALJ should have accorded Dr. Fellows's opinion controlling weight (Doc. 14 at 8-9), and failed to give "good reasons" for this decision, (*Id.* at 7); and (2) that the ALJ neither properly considered medical source opinions, nor adequately explained why he did not adopt contradicting medical source opinions (*Id.* at 9-12). I address each argument in turn.

#### 1. The ALJ Gave Good Reasons for Giving Dr. Fellows's Opinion Little Weight

Helsel first claims that the ALJ should have accorded Dr. Fellows's opinion at least great, if not controlling weight, and that his failure to do so constitutes error. This argument logically implies that Dr. Fellows was Helsel's treating physician, and that his opinion offered a "detailed, longitudinal" picture of her impairments to an extent unmatched by other medical sources in the record. 20 C.F.R. § 404.1527(c)(2).

The Regulations define "treating source" as an "acceptable medical source who provides [a claimant], or has provided [a claimant], with medical treatment or evaluation

*and* who has, or has had, an *ongoing treatment relationship* with" a claimant. 20 C.F.R. §

404.1502 (emphasis added). "A single examination does not suffice to create a treating

relationship." *Luteyn v. Comm'r of Soc. Sec.*, 528 F.Supp.2d 739, 743 (W.D. Mich. 2007)

(citing *Kornecky v. Comm'r of Soc. Sec.*, 167 F App'x. 496, 506 (6th Cir. 2006) ("A

plethora of decisions unanimously hold that a single visit does not constitute a treating

relationship.")). Where an opinion from a treating source is "well-supported by medically

acceptable clinical and laboratory diagnostic techniques" and "not inconsistent with the

other substantial evidence" in a case record, the ALJ must give it "controlling weight." 20

C.F.R. § 404.1527(c)(2). If the opinion is not given controlling weight, the ALJ must

engage in the six-factor balancing test described in § 404.1527(c)(2)-(6).

Helsel quotes the Sixth Circuit's opinion in *Walker v. Secretary of Health &*
*Human Services*, 980 F.2d 1066, 1070 (6th Cir. 1992), which holds that a treating

source's opinion must be given "complete deference" if not contradicted. This doctrine

rests on the notion that "a medical professional who has dealt with a claimant and his

maladies over a long period of time will have a deeper insight into the medical condition

of the claimant than will a person who has examined a claimant *but once*, or who has

only seen the claimant's medical records." *Barker v. Shalala*, 40 F.3d 789, 794 (6th Cir.

1994) (emphasis added). Even if not controlling, such opinions "are only accorded great

weight" when "supported by sufficient clinical findings" and "consistent with the

evidence." *Cutlip v. Sec'y of Health & Human Servs.*, 25 F.3d 284, 287 (6th Cir. 1994).

Unfortunately for Helsel, her objections cannot prevail, and *Walker* can provide

her little solace. In the first instance, the ALJ proved overly generous in treating Dr.

18

Fellows's opinion as that of a *treating* source, as he only evaluated Helsel once in March 2013. (Tr. 472). A medical relationship with such limited interchange "does not suffice to create a treating relationship." *Luteyn*, 528 F.Supp.2d at 743. That Dr. Fellows counter-signed a later examination by Helsel's therapist, Dr. Karczewski, does nothing to rebut this fact. Said evaluation reflected Dr. Karczewski's perspective and differed in significant respects from Dr. Fellows's earlier evaluation of Helsel; for instance, Dr. Fellows's solo evaluation diagnoses PTSD and *rules out* psychosis, whereas Dr. Karczewski's evaluation diagnoses Psychotic Disorder not otherwise specified. *Compare* (Tr. 472), *with* (Tr. 486). The ALJ alludes to these discrepancies in his review. (Tr. 21). A therapist is not an "accepted medical source," and Dr. Fellows's signature at the bottom does not operate to make it so. *See Richardson v. Comm'r Soc. Sec.*, No. 15-0708, 2016 WL 3586623, at *6 (W.D. Mich. 2016) ("[A]dding [physician] Dr. Bedi's signature to [therapist] Mr. Davis' statements 'did not transform those opinions into the opinions of a treating physician." (internal quotation marks omitted)); *Matelske v. Comm'r of Soc. Sec.*, No. 12-93, 2013 WL 4520202, at *3 (refusing to attribute to physician a medical opinion transcribed in therapist's handwriting on his behalf).

Even if Dr. Fellows's signature *were* enough to transform Dr. Karczewski's opinion into his own, as Helsel suggests, the ALJ presented "good reasons" to discredit the opinion. *See Martin v. Comm'r of Soc. Sec.*, No. 16-5013, 2016 WL 4151380 (6th Cir. 2016) (noting that where the ALJ gives good reasons for discounting a medical opinion, mistaken attribution as an "other source" rather than an "acceptable medical source" is harmless).

The ALJ must "always give good reasons" for the weight given a "treating source's opinion." 20 C.F.R. § 404.1527(c)(2). These reasons must be "supported by the evidence in the case record," and "sufficiently specific to make clear to any subsequent reviewers the weight the adjudicator gave to the treating source's medical opinion and the reasons for that weight." SSR 96-2p, 1996 WL 374188, at *5 (July 2, 1996).

As a threshold matter, and for the reasons discussed above, Dr. Fellows does not qualify as a treating physician. The requirement Helsel seeks to invoke thus has no bearing on the ALJ's treatment of Dr. Fellows's opinion.

But supposing, for the sake of argument, the ALJ *did* have to list "good reasons" for discounting Dr. Fellows's opinion—the reasons supplied in the ALJ's review certainly find support in the record and communicate with sufficient clarity the weight given his opinion, as well as the reasons for that weight. The ALJ straightforwardly explains that "[l]ittle weight is given to the assessment of Neal Fellows, D.O., even though he is the claimant's treating psychiatrist." (Tr. 20). He then notes how the marked limitations to which Dr. Fellows referred were "not consistent with the claimant's lack of psychiatric hospitalizations or with her ability to live in her own home and be the primary caregiver for two young children," as well as "the GAF of 55 that Dr. Fellows assessed for the claimant, which indicates moderate limitations." (Tr. 20). Though Helsel decries the supposed lack of clarity in these findings, (Doc. 14 at 8), her complaint fails to persuade. Indeed, there seems a commonsense connection between the ability to adequately care for children (even where help is offered or solicited) and self-sufficiency. Substantial evidence suggests that Dr. Fellows's opinion exaggerates the extent of

20

Helsel's impairments. This inconsistency is sufficient to justify withholding "controlling weight." 20 C.F.R. § 404.1527(c)(2). And in the words of the *Walker* court, "[i]f the medical evidence [is] contradictory then our review [must] go no further." 980 F.2d at 1070.

In addition, the co-signed report is in check-box format, and thus would prove an impotent addition to the record, boasting little to no persuasive value. To hold otherwise neglects its glaring lack of narrative analysis. *See, e.g.*, *Ellars v. Comm'r of Soc. Sec.*, No. 15-4039, 2016 WL 2610234 at *2 (6th Cir. 2016) ("[T]he administrative law judge properly gave a check-box form little weight where the physician provided no explanation for the restrictions entered on the form and cited no supporting objective medical evidence."); *see also Hernandez v. Comm'r of Soc. Sec.*, No. 15-1875, 2016 WL 1055828 at *4 (6th Cir. 2016) ("Even if the ALJ erred in failing to give good reasons for not abiding by the treating physician rule, it was harmless error because the [medical source statement] here is 'weak evidence at best' and meets our patently deficient standard."); *accord Mason v. Shalala*, 994 F.2d 1058, 1065 (3d Cir. 1993) ("Form reports in which a physician's obligation is only to check a box or fill in a blank are weak evidence at best.").

Helsel falls back on the *Walker* opinion, which reversed and remanded an ALJ's opinion for incorrectly assessing a treating physician's opinion as inconsistent with the medical testimony. *See* 980 F.2d at 1069. In *Walker*, the claimant's treating physician supposed that the combination of physical and mental impairments would preclude substantially gainful activity; the ALJ, however, found this opinion inconsistent with

medical testimony that therapy and medication had improved the claimant's physical impairment. The *Walker* court found error because the ALJ "failed to consider the combined effect of both [mental and physical] impairments on Walker's ability to function." *Id.* at 1071. But Helsel's *Walker* argument is inapposite for two reasons:

First, the facts of this case are easily distinguished. The ALJ in *Walker* found inconsistency in medical opinions where none existed because he sidestepped an analysis of "the combined effect of both [mental and physical] impairments." *Id.* at 1071. By contrast, the ALJ in this case considered Helsel's physical and mental impairments both singly and in combination, finding mild restrictions in daily living, moderate restrictions in social functioning, and moderate restrictions in concentration, persistence and pace. (Tr. 16-20). He then found all such impairments capable of accommodation with light work "limited to simple, routine, and repetitive tasks in a work environment free of fast paced production requirements involving only simple work related decisions and routine work place changes," where the job does not involve "climb[ing] ladders, ropes, or scaffolds" or "operat[ing] foot controls with the lower extremities." (Tr. 16-17).

Second, the *Walker* court reasons that treating physicians have "a greater opportunity to examine and observe the patient" and "[are] generally more familiar with the patient's condition than are other physicians." 980 F.2d at 1070. As discussed at length above, the record shows that Dr. Fellows met with Helsel only once; there is little indication that his limited exposure to Helsel afforded him the opportunity to "provide a detailed, longitudinal picture" of her impairments. 20 C.F.R. § 404.1527(c)(2). As such,

the policy reasons encouraging deference to treating source's opinions does not apply here.

### 2. The ALJ's RFC Assessment Adequately Resolves Material Inconsistencies, Considers and Addresses Each Medical Opinion, and Explains Why Contradictory Opinions Were Not Adopted

Without explicitly saying so, Helsel cites certain provisions drawn from SSR 96-8p, 1996 WL 374184 (July 2, 1996), and implies that the ALJ's RFC assessment runs afoul in a general sense. (Doc. 14 at 9).  SSR 96-8p, 1996 WL 374184 (July 2, 1996), requires RFC assessments to include a "narrative discussion describing how the evidence supports each conclusion," and ultimately to explain how "material inconsistencies or ambiguities in the evidence in the case record were considered and resolved." *Id.* at *7. An ALJ may not avoid considering medical source opinions, and where the RFC assessment conflicts with such an opinion, the ALJ "must explain why the opinion was not adopted."

The RFC assessment in this case plainly fulfills this standard. Throughout his assessment, the ALJ juggles numerous medical and non-medical evidence in the record, explaining what weight he accorded each source and why. (Tr. 18-20). In addition, the ALJ parses material inconsistencies via credibility analyses. (Tr. 18) ("The claimant was partially credible, but not fully so. The greatest inconsistency in the file is that the claimant lives in her own home and is the primary caregiver for her two young children."). More importantly, there substantial evidence undergirds the ALJ's findings. He notes that the "ability to live in one's own home and be the primary caregiver for

23

young children is markedly inconsistent with allegations of disabling mental impairments." (Tr. 19). The ALJ includes in his review Ms. Heinz's statements that Helsel cleaned and did laundry. (Tr. 19). That Helsel "prepares microwave meals," "often has a friend or her mother help her with chores," and cleans, feeds, and plays with her children also persuaded the ALJ that her impairments did not preclude substantial gainful employment. (Tr. 18). And Helsel's March 2012 statements that she shopped and attended church despite her alleged antisocial predilections harmed her credibility, in the ALJ's eyes, as to the "intensity, persistence and limiting effects" of her symptoms. (*Id.*) The Sixth Circuit regularly denies benefits to similarly situated claimants. *See, e.g.*, *Rabbers v. Comm'r Soc. Sec. Admin.*, 582 F.3d 647, 658 (6th Cir. 2009) ("The claimant described . . . doing household chores and watching television."); *Foglesong v. Sec'y of Health & Human Servs.*, No. 93-5190, 1994 WL 58993, at *1 (6th Cir. 1994) ("She reads, watches television, listens to music, . . . visits her children at least once a week for a couple of hours, regularly attends church, and socializes with friends."); *Listenbee v. Sec'y of Health & Human Servs.*, 846 F.2d 345, 347 (6th Cir. 1988) ("[H]e does his own shopping, laundering, vacuuming, and cooking."); *Gillespie v. Sec'y of Health & Human Servs.*, 1986 WL 16024, at *2 (6th Cir. 1986) ("All of the doctors agree that claimant suffers from depression and has suicidal ideation. Essentially, they all also agree that her intellectual functioning is intact, that she is oriented, she has a fair ability to care for her needs, a moderate impairment in relating to others, normal speech and normal abstract reasoning, and a moderate impairment with respect to concentration and attention."). As such, the ALJ's findings are bolstered by substantial evidence and should be upheld.

24

Of note, other circuits have found the above-enumerated factors similarly discrediting. *See, e.g.*, *Novy .v Astrue*, 497 F.3d 708, 710 (7th Cir. 2007) ("She lives on her own, taking care of three children . . . without help, feeding herself and them, . . . sufficiently well that they have not been adjudged neglected and removed from her custody by the child-welfare authorities, paying her bills, avoiding eviction."); *Johnston v. Apfel*, 210 F.3d 870, 875 (8th Cir. 2000) ("Johnston was the primary caregiver for her young daughter . . . ; she did some housework, shopping, and cooking; she handled her own money; and she was attending school."); *Jones v. Comm'r of Soc. Sec.*, No. 94-3987, 1995 WL 675580, at *2 (6th Cir. 1995) ("[T]he evidence reveals that Jones does not experience marked restrictions in daily activities nor in social functioning as she is able to fully care for her four school-age children, clean her home, shop, watch television, visit relatives, and attend church on a regular basis.").

Helsel counters the ALJ's assessment with *Walston v. Gardner*, 381 F.2d 580, 586 (6th Cir. 1967), which declares that the ability to "perform simple functions . . . does not necessarily indicate . . . an ability to engage in substantial gainful activity." Though this may ostensibly present a tempting counterpoint to the ALJ's RFC assessment—namely, that the capacity to engage in intermittent and non-continuous activities with difficulty should not preclude a finding of disability—the language in *Walston* does not lend itself to such broad construction. *See* 381 F.2d at 586. Rather, the opinion declares narrowly that disability exists "if [one] can engage in substantial gainful activity only by enduring *great pain*." *Id.* (emphasis added).

Gauging a claimant's hardship falls squarely within the scope of the ALJ's fact-finding discretion, and the Sixth Circuit affords the ALJ considerable leeway in this realm. *See Turcus v. Soc. Sec. Admin.*, 110 F App'x. 630, 632 (6th Cir. 2004) (citing *Gooch v. Sec'y of Health & Human Servs.*, 833 F.2d 589, 592 (6th Cir. 1987)) ("Credibility determinations rest with the ALJ . . . . [T]he reviewing court does not substitute its opinion for that of the ALJ."). Put simply, the ALJ determined that Helsel's "statements concerning the intensity, persistence and limiting effects of [her] symptoms [were] not entirely credible" for a variety of reasons, (Tr. 18), including her ability to care for her children, (*Id.*), attend church regularly, (*Id.*), cook and clean, (Tr. 19), and pleasantly engage with her examiners at NLCMH, (Tr. 17), among other factors. When, as here, the ALJ assessed the entire record, determined that Helsel's impairments were mild and moderate, and found jobs in the national marketplace that could accommodate her impairments, he did not *err*; he merely determined that whatever pain Helsel endures does not *disable* her. *Bailey v. Comm'r of Soc. Sec.*, 623 F.Supp.2d 889, 902 (W.D. Mich. 2009) ("[P]ain may or may not be disabling.")

That I recommend upholding the ALJ's conclusion does not invalidate some gripes with his analysis. "Disability does not mean that a claimant must vegetate in a dark room excluded from all forms of human and social activity." *Smith v. Califano*, 637 F.2d 968, 971 (3d Cir. 1981). That Helsel is "married" and "pregnant for a third time," (Tr. 17), hardly evidences comfort in social functioning, especially when one considers that she and her husband are separated. (Tr. 32). Nor do the facts that "she has a friend" and "her parents visit her home to help her" contradict statements that she does not want to be

26

around others. (Tr. 19). However, disagreement with this portion of the ALJ's analysis does not warrant remand where, as here, there was additional substantial evidence behind each aspect of the ALJ's findings. *See Smith-Felder v. Comm'r of Soc. Sec.*, 103 F.Supp.2d 1011, 1013-14 (E.D. Mich. 2000).

### H. Conclusion

For the reasons stated above, the Court **RECOMMENDS** that Helsel's Motion for Summary Judgment (Doc. 14) be **DENIED**, the Commissioner's Motion (Doc. 16) be **GRANTED**, and that this case be **AFFIRMED**.

## III.   <u>REVIEW</u>

Pursuant to Rule 72(b)(2) of the Federal Rules of Civil Procedure, "[w]ithin 14 days after being served with a copy of the recommended disposition, a party may serve and file specific written objections to the proposed findings and recommendations. A party may respond to another party's objections within 14 days after being served with a copy." Fed. R. Civ. P. 72(b)(2); *see also* 28 U.S.C. § 636(b)(1). Failure to file specific objections constitutes a waiver of any further right of appeal. *Thomas v. Arn*, 474 U.S. 140, 106 S. Ct. 466, 88 L. Ed.2d 435 (1985); *Howard v. Sec'y of Health & Human Servs.*, 932 F.2d 505 (6th Cir. 1991); *United States v. Walters*, 638 F.2d 947 (6th Cir. 1981). The parties are advised that making some objections, but failing to raise others, will not preserve all the objections a party may have to this Report and Recommendation. *Willis v. Sec'y of Health & Human Servs.*, 931 F.2d 390, 401 (6th Cir. 1991); *Dakroub v. Detroit Fed'n of Teachers Local 231*, 829 F.2d 1370, 1373 (6th Cir. 1987). Pursuant to

E.D. Mich. LR 72.1(d)(2), a copy of any objections is to be served upon this magistrate judge.

Any objections must be labeled as "Objection No. 1," "Objection No. 2," etc. Any objection must recite precisely the provision of this Report and Recommendation to which it pertains. Not later than 14 days after service of an objection, the opposing party may file a concise response proportionate to the objections in length and complexity. Fed. R. Civ. P. 72(b)(2); E.D. Mich. LR 72.1(d). The response must specifically address each issue raised in the objections, in the same order, and labeled as "Response to Objection No. 1," "Response to Objection No. 2," etc. If the Court determines that any objections are without merit, it may rule without awaiting the response.

Date:  September 7, 2016                         S/ PATRICIA T. MORRIS
                                                Patricia T. Morris
                                                United States Magistrate Judge

## CERTIFICATION

I hereby certify that the foregoing document was electronically filed this date through the Court's CM/ECF system which delivers a copy to all counsel of record.

Date: September 7, 2016                          By s/Kristen Castaneda
                                                Case Manager